Sylvester SMUGALA, Appellant,

v.

Vincent CAMPANA, Respondent.

No. 50967.

Supreme Court of Missouri,
Division No. 1.

July 11, 1966.

Donald S. Hilleary, Clayton, for appellant.

Morris, Wuestling & James, William F. James, St. Louis, for respondent.

HENLEY, Judge.

■ This is an action for $40,000 damages for personal injuries. Plaintiff, a passenger in the automobile of defendant, was allegedly injured when defendant's automobile collided with the rear of another automobile. Judgment was for plaintiff for $850, from which he appeals. One of his two assignments of error is that the trial court abused its discretion in denying him a new trial on the ground that the verdict was grossly inadequate. The amount in dispute is the difference between that sued for and the amount of the verdict and judgment, or $39,150. Miller v. Harner, Mo., 373 S.W.2d 941, 942 [1]. This court has jurisdiction because the amount in dispute exceeds $15,000. Article V, § 3, Constitution of Missouri, V.A.M.S.; § 477.040, RSMo 1959, V.A.M.S.

On Wednesday morning, April 12, 1961, plaintiff and defendant, both employees of Sodemann Heat and Power Company, were enroute in defendant's automobile to Monsanto Chemical Company where they were to work that day. Defendant was driving and plaintiff was sitting on the right hand side of the front seat. While defendant was driving south on Lindbergh Boulevard approaching its intersection with Brown Road in St. Louis County, his automobile collided with the rear of an antomobile stopped by a traffic light. Anticipating the collision, plaintiff braced himself with his feet on the floor and his hands on the dashboard. At impact, his body bent slightly forward from the waist but struck no part of the automobile. After the collision, plaintiff and defendant proceeded to their place of employment, where plaintiff worked the balance of that day and the whole of the next day, doing light work on the suggestion of his foreman. On Thursday evening, plaintiff went to his family doctor complaining of pain in his back. On the following Monday he was sent by his doctor to an orthope-

dist who examined and hospitalized him at DePaul Hospital where he remained for the next seven days. The hospital record shows a diagnosis on admission of: "acute back strain and a questionable chip fracture [of the second lumbar vertebra] with a definite limitation of motion [in the back and lower extremities], where he experiences severe pain on extension, and rigidity of the back muscles."

Plaintiff contends that as a direct result of the collision he sustained an acute back strain and a "possible" fracture of the first and second lumbar vertebrae, which caused him to incur medical and hospital expense of $574.45 and lose wages in the sum of approximately $1,100; that the verdict of $850 not only fails to compensate him for that expense but fails to award him anything for his pain, discomfort and permanent injury; and, that the verdict was so grossly inadequate as to indicate bias and prejudice against him by the jury. He further contends that for these reasons the court erred in not granting him a new trial on all issues or on the issue of damages alone. Defendant contends that a consideration of the evidence pertaining to the extent of plaintiff's claimed injuries and damage demonstrates that there was a question for the jury in the first instance, and for the trial judge on motion for new trial, as to whether plaintiff received the injuries alleged or suffered the damage allegedly resulting therefrom in this collision; and, that the trial court did not abuse its discretion in overruling plaintiff's motion for new trial.

Plaintiff, aged 34 years at the time of trial in March, 1964, testified: that he was, and had been for several years, a sheet metal worker; that his employment as such required him to handle, fabricate and install sheet metal ducts for installation of air-conditioning equipment, guttering and furnaces, and to handle and lift heavy objects; that he had been steadily employed by the Sodemann Company for about five years before this automobile accident, but was now unemployed; that at the end of the day of

this accident his back was sore and he was suffering pain although he had done only light work; that on Monday, after the collision on Wednesday morning, he entered DePaul Hospital suffering considerable pain in his lower back; that he was in the hospital seven days and received heat therapy treatments and "rubdowns"; that he was fitted with a back brace or belt in the nature of a corset which he wore part-time while in the hospital and part-time after he returned to work; that on his release from the hospital he did not immediately go back to work but stayed at home; that he was released by his doctor to return to work and did return to his employment on May 2, but performed only light work.

He had suffered two prior injuries to his back, one in 1955 or 1956, and the other within a year before this collision. He testified that he received medical attention for both, but lost no time from work because of those injuries. He further testified that he had a stomach ulcer for which he was on medication at the time of this accident; that the ulcer had been dormant for several years and was aggravated by the automobile accident of April 12, as a result of which he has been and is highly nervous.

On May 9, about a week after he returned to work, he injured his back again while correcting his small son and was hospitalized therefor from May 11 to 17. He returned to his employment on June 26, doing only light work until he was "laid-off" on August 12; this was a general "lay-off" of employees by his employer for lack of work. He was unemployed until August 23, during which period, he says, he worried about this and the previous periods of unemployment and lack of income. He further testified that he went to work for Ryan Heating Company on August 23, and shortly thereafter became very tense and nervous because of worry; that he suffered a nervous breakdown and was hospitalized thirty-six days at Alexian Brothers Hospital; that he still suffers from this nervous condition and that as a result of this condition and his back injury he is unable to perform his usual work. After release from Alexian Brothers he injured his back again while picking up his son, and was unemployed until April, 1962.

On cross-examination, plaintiff testified: that he was released by his doctor to return to work shortly after his first hospitalization, probably about April 24, 1961; that he has had no treatment for his back condition since his hospitalization for the injury received at his home in May, 1961; and, that for about a year before this automobile accident he received treatment from a doctor for a nervous condition.

The records of DePaul Hospital for the hospitalization resulting from the injury at his home notes the April injury and then mentions that plaintiff had been having nervous spells for about a year, that he had a nervous attack the day before and "forgot all about the back pain." The hospital X ray report shows: "No bony destruction was demonstrated. The intervertebral spaces are preserved. No evidence of fracture."

Dr. Donald E. Callahan, a physician specializing in roentgenology, testified on behalf of plaintiff that at the request of the latter's family doctor he took X rays of plaintiff's lower back on April 14, 1961. He identified these X rays at the trial and testified that one view showed what appeared to him to be a slight deformity of the first lumbar vertebra, but that there was no evidence of fracture; that L-1 "is down just a little bit in front * * * suggestive of an injury * * * called a compression fracture." On cross-examination, Dr. Callahan testified that he had seen later X rays taken by another of plaintiff's lumbar vertebrae showing no change in L-1; that he now considered it highly questionable whether plaintiff had received a compression fracture; that because the later X rays showed no change in condition he is of the opinion the deformity he saw would not be disabling; that he does not now think that what he at first considered to be a

compression fracture could have been the result of an injury received two days before April 14, 1961; and that it is possible that the deformity he saw was the result of an injury that occurred as much as four to six years before the collision.

Dr. Harold E. Walters, a physician and surgeon, testified on behalf of plaintiff that he examined plaintiff in October, 1961, and in January and October, 1963, but did not treat him; that on each occasion his complaints were of pain and soreness in his lower back; that plaintiff gave him a history of a fracture of the first lumbar vertebra received in a collision in April, 1961; that he found tenderness of the soft tissues on both sides of the upper lumbar vertebrae; that plaintiff was able to move his back and legs through normal range, but in doing so complained of discomfort in the lumbar area; that his X rays revealed a mild curvature of the back with some arthritis, but no evidence of a fracture. On cross-examination, the doctor testified that he found no signs of muscle spasm or rigidity, and found "nothing objectively wrong with him [that would] account for his complaints"; that he found no objective sign of injury; that he was informed of plaintiff's history of an ulcer and hospitalization for nervousness, but that plaintiff did not complain to him that the ulcer was aggravated as a result of the April, 1961, automobile collision.

Dr. Henry E. Lattinville, a physician specializing in neurosurgery, testified on behalf of defendant that he examined plaintiff at defendant's request in January, 1963; that plaintiff's complaints were: that he had recurrent attacks of pain in his back from an April, 1961, automobile collision; that the pain would subside for a day or two only to recur several days or a week or two later; that he was still fearful he would incur a snapping of his back again, causing him to fall and injure himself; that plaintiff made no complaints of nervousness. He further testified that he made a complete neurological examination, including X rays and tests to determine whether there was any impairment of the lower back; that he found no objective evidence of injury; that the X rays did not show any evidence of bone involvement. On being informed that plaintiff claimed that he had been suffering from extreme nervousness since the summer of 1961, the doctor further testified that he found no neurological signs that could account for plaintiff's nervousness, and no signs of disability as a result of nervousness. In reply to a hypothetical question on cross-examination, the doctor testified that there was no causal relationship between the automobile collision and plaintiff's hospitalization for nervousness at Alexian Brothers Hospital.

There was no medical evidence that the automobile collision aggravated the pre-existing ulcer.

■ There is some conflict in the evidence as to the cause and extent of plaintiff's alleged injuries and his damage allegedly resulting therefrom. However, it is obvious that there is little, if any, conflict in the medical evidence. Our function is not to decide such conflict as exists; it is to determine whether defendant's theory is supported by substantial evidence. In Mitchell v. Mosher, Mo., 362 S.W.2d 532, 536 [2–4], this court stated: "In considering whether the trial court erred in overruling plaintiff's motion for a new trial predicated upon inadequacy of the verdict, the appellate court' views the evidence in the light most favorable to the ruling of the trial court. Polizzi v. Nedrow, Mo., 247 S.W.2d 809, 811; Glore v. Bone, Mo., 324 S.W.2d 633, 635 [3]; Pinkston v. McClanahan, Mo., 350 S.W.2d 724, 728 [2], [3]. The appellate court, unlike the trial court, does not weigh the evidence. Rather, it seeks to ascertain only whether the trial court abused its discretion in ruling as it did. In other words, was there substantial evidence to support the verdict? 'Substantial evidence to support the verdict', as that phrase is applicable to the question here presented, requires determination of whether the amount of damages

awarded is responsive to the evidence; and where the jury, as in this case, has found liability, it is also the jury's duty to award plaintiff damages commensurate with the personal injuries and other compensable loss sustained by him."

Neither Dr. Walters nor Dr. Lattinville found on examination of plaintiff any evidence of fracture of any portion of plaintiff's lower back. As we interpret the testimony of all three doctors, none found any objective evidence on which he could base a finding that there was any causal relationship between the automobile collision of April 12, 1961, and plaintiff's alleged "possible" fracture of lumbar vertebrae and back strain, or his nervous breakdown or his complaints of nervousness, pain and suffering. Our conclusion is that the medical evidence adduced by defendant, and the medical evidence adduced by plaintiff, constituted substantial evidence that neither the major portion of plaintiff's medical expense nor any appreciable portion of the injuries and damage of which he complains was attributable to such injury as he may have sustained in this collision.

■ The jury may well have found the evidence of injury and damage to be as related by the three doctors. We cannot say that the verdict was grossly or shockingly inadequate in the light of this evidence. The trial court, whose duty it was to weigh the evidence in ruling this assignment in the motion for new trial, did not so find. There was no abuse of discretion on the part of the trial court in this respect.

Plaintiff's second assignment is that the court erred in failing to grant him a new trial for the reason that one of the jurors was biased and prejudiced against him because the juror heard plaintiff's neighbor state "that plaintiff had a violent temper and took it out on his kids"; and that he was thereby denied the deliberation of twelve impartial jurors.

This assignment of error in the motion for new trial was supported by the affidavit of Ann O. Swofford, one of the jurors, stating that: "After the trial was over I heard Ralph H. Schroeder [another juror] state that he has been told by a neighbor of Mr. Smugala's that Mr. Smugala had a violent temper and was rough on his wife and kids." Over the objection of defendant that the testimony would be inadmissible because it would be hearsay and because a juror may not be heard to impeach his verdict, the court heard the testimony of Mrs. Swofford offered by plaintiff in support of his motion. Mrs. Swofford testified: that she heard Mr. Schroeder make the above statement after the jury completed its deliberations and had returned its verdict, that it was after they had returned from lunch to the jury's assembly room to await a call to try another case; that Mr. Schroeder did not impart this information to any of the jurors during their deliberations. This was a ten-man verdict not signed by Juror Schroeder.

■ The well-founded and long-established rule, based on sound public policy, is that the affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury. Woehler v. City of St. Louis, 342 Mo. 237, 114 S.W.2d 985, 987 [4], and cases there cited; Cook v. Kansas City, 358 Mo. 296, 214 S.W.2d 430, 433–434 [9–11]. And it matters not whether the juror from whom the impeaching evidence may come concurred in or dissented from the verdict. Davis v. Kansas City Public Service Co., Mo., 233 S.W.2d 669, 676 [6] and cases there cited. The court erred in admitting this evidence, but plaintiff may not have the benefit of error favoring him and for which he was the sponsor. Although heard by the trial court, we may not for the reasons above stated, consider this evidence in ruling this assignment. Woehler v. City of St. Louis, supra. We hold that the court did not err in failing to grant plaintiff a new trial on

the grounds stated in this assignment of error.

The record does not indicate whether the trial judge considered this evidence in overruling plaintiff's motion for new trial; it may very well be that he did not, for he stated that he agreed with the grounds of defendant's objection but would hear the evidence to see what it might develop. There was no evidence that during the deliberations of the jury, Juror Schroeder had the information he imparted to Juror Swofford after the verdict was reached and the case closed, or that he was at any time prejudiced against plaintiff by reason of that information. But assuming that the trial judge did consider it, we could not say that on this limited and inapposite evidence he did not exercise a sound judicial discretion in overruling the motion. Wood v. Claussen, Mo.App., 207 S.W.2d 802, 812 [13]; Davis v. Kansas City Public Service Co., supra, 233 S.W.2d l. c. 676 [8].

The judgment is affirmed.

All concur.